UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JOAN ELIZABETH WESER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:17-CV-473 |
| | ) |
| KIMBERLY GOODSON, LANCE ANDERSON | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINON AND ORDER

Before the Court are Defendants' renewed summary judgment motions seeking judgment in their favor on Plaintiff's federal claims under 42 U.S.C. § 1983 and state claims for false arrest, malicious prosecution, and false imprisonment arising out of her arrest by Defendant Loudon County Deputy Sheriff Lance Anderson for criminal trespass in violation of Tennessee Code Annotated § 39-14-405. [Docs. 72; 76]. Also before the Court is Defendant Kimberly Goodson's motion to stay scheduling order deadlines. [Doc. 85]. The matters are now ripe for review.

I. FACTUAL BACKGROUND

The facts taken in the light most favorable to the plaintiff are set forth below. In March, 2016, Plaintiff Joan Elizabeth Weser, and Defendant Kimberly Goodson, met through the cat specific non-profit animal rescue volunteer organization, Loudon County Friends of Animals ("LCFOA"). Defendant Goodson founded LCFOA and serves as its president; Plaintiff volunteered within the organization. [Docs. 72-1 at 13-14; 72-2 at 3-4]. In 2016, both women served on LCFOA's board of directors. [Doc. 72-2 at 4, 7]. The women volunteered together at LCFOA four days a week. Their close working relationship evolved into a friendship. [*Id.* at 5].

Plaintiff owned a farm property at 4511 Watkins Road in Loudon County, Tennessee ("the farm"), on which she allowed LCFOA to operate a cat rescue facility. [Doc. 72-1 at 3]. The property was used by

1

LCFOA from June 2016, and up until the organization withdrew and ceased operations in October, 2016. [*Id.* at 3-4; Doc. 72-2 at 6].

In late September, 2016, Plaintiff and Defendant Goodson's relationship began to deteriorate after an argument over proper animal population management techniques, specifically the spaying and neutering of the farm cats. [Doc. 72-2 at 7-8]. The disagreement escalated during the following weeks, culminating in Plaintiff and Defendant Goodson parting ways, and Plaintiff's removal as a LCFOA director. [*Id.* at 7]. After LCFOA terminated operations on the farm in October, 2016, twelve LCFOA shelter cats and kittens remained on Plaintiff's property. [Docs. 72-1 at 9; 72-8]. As of November 7, 2016, the farm housed the LCFOA cats and kittens but also a number of cats from feral trappings, totaling to approximately thirty-eight cats and kittens living on the property. [Doc. 72-2 at 12].

In a November 3, 2016 letter to Plaintiff, Defendant Goodson wrote that the twelve remaining LCFOA farm cats needed to be transitioned into foster care by November 12, 2016. [Doc. 72-8]. The letter stated that Plaintiff should "[c]ontact Lee Ann Burgett on time and date [LCFOA] can pick these [kittens] up either Monday November 7, Friday November 11 or Saturday, November 12, 2016. [*Id.*]. The letter stated that if Plaintiff would not release the cats and kittens to LCFOA by Saturday, November 12, 2106, "they will become property of [Plaintiff's] after [that] date and [LCFOA] will mail [] the records." [*Id.*]. The letter also informed Plaintiff that Defendant Goodson would be "spending 3 days in Nashville . . . next week," referring to the week of November 7, 2016. [*Id.*].

After arriving home from Ohio around 5:00 to 6:00 p.m. in the evening on November 7, 2016, Plaintiff checked her mail, and "saw the letter" from LCFOA and went to "check[] on the farm." [Doc. 72-1 at 11]. At the farm, Plaintiff encountered LCFOA volunteer Ms. Lee Ann Burgett. Plaintiff inquired if Ms. Burgett could take the LCFOA farm cats from the property that day; Ms. Burgett responded that could not take the cats, because her poodle was in poor health. [*Id.* at 7; 72-3 at 3, 7]. Plaintiff informed Ms. Burgett that she would be taking the cats to Defendant Goodson, to which Ms. Burgett replied that Defendant Goodson was scheduled to be in Nashville for a medical appointment the next day. [Doc. 72-3 at 8].

Plaintiff called and subsequently messaged Defendant Goodson on Facebook Messenger to tell her the cats were going to be dropped off at her house that evening. [Doc. 72-9 at 4-5]. Defendant Goodson messaged a reply, "[w]ell can't take them now. Friday or Saturday is the only time. I will be gone the rest of the week. We will pick them up Friday or Saturday." [*Id.* at 5]. The reply indicated that she could not take the cats, because there was no place for them that day and arrangements for the cats would have to occur at a later date, because she was going to be out of town the next day. [Docs. 72-1 at 8-9, 15; 72-2 at 13; 72-9 at 5]. Plaintiff responded, "[t]hey are, coming now. [I] am not available any other time." [Doc. 72-9 at 4]. Defendant Goodson answered that, in that case, the cats belong to Plaintiff. [*Id.*].

Around 7:00 p.m., Plaintiff "put the animals in a large crate and started [on her] way" to the Goodson house, located at 231 Oligi Circle in Loudon County, Tennessee. [Docs. 72-1 at 6, 13; 72-2 at 2]. Plaintiff stated that she assumed that if the "foster was going to take the cats, that [Defendant Goodson] would take the cats." [Doc. 72-1 at 10]. Plaintiff further stated that Defendant Goodson "was only going to be gone for one day" and that because most animal rescuers put their animals in a garage or other areas of a house safely, she did not "think there would have been an issue at all." [*Id.* at 8, 15]. Plaintiff decided to return the LCFOA farm cats to Defendant Goodson, because she was "the one person who could move them to where they needed to be," and Plaintiff could not find them fosters or help adopt them out. [*Id.* at 15].

Upon arrival at the Goodson property, Plaintiff backed her Subaru Outback into the end of the driveway, lifted the hatch, and unloaded a crate full of cats. [*Id.* at 9, 13, 14]. Plaintiff placed the crate outside on the ground on the driveway in front of the garage. [Doc. 72-1 at 10]. Plaintiff texted Ms. Burgett and called another LCFOA volunteer to inform them of the dropped off cats at the Goodson property. [*Id.* at 11; 72-9 at 3]. At 7:08 p.m., Plaintiff Facebook messaged Defendant Goodson: "Cats in the driveway. Not my problem. Several are sick." [Docs. 72-2 at 14; 72-9 at 6].

Concerned for the cats' safety resulting from the cold air and the falling evening temperature, Plaintiff drove off but circled back "to be sure the cats and kittens were taken inside." [Doc. 72-1 at 11].

3

Defendant Goodson, who was home at the time, observed the crate on her driveway, and Plaintiff inside her car parked at the end of the driveway. [Doc. 72-2 at 15]. In response, Defendant Goodson called Loudon County 911. [*Id.* at 14, 15]. After receiving a 7:21 p.m. call for an unwanted guest, Defendant Deputy Anderson and Deputy Brewer responded and were dispatched to Defendant Goodson's residence. [Docs. 72-1 at 13; 72-2 at 22; 72-4 at 6; 72-5 at 11; 72-10]. Defendant Deputy Anderson was previously dispatched approximately an hour earlier to another call, where he had taken Plaintiff's statement, involving a dispute amongst Plaintiff and her residential neighbors. [Docs. 72-1 at 13; 72-12; 72-14].

Upon arrival at the Goodson residence, as the incident report details, Deputy Brewer pulled up and parked his vehicle behind Plaintiff's car and approached Plaintiff sitting in her car in the roadway in front of the residence. [Docs. 72-1 at 13; 72-11]. Plaintiff admitted she was the one who dropped the cats off. [Doc. 72-5 at 16]. Deputy Brewer asked Plaintiff to leave the area, and Plaintiff refused until the cats were taken inside from the driveway by Defendant Goodson. [Doc. 73-4 at 10]. Deputy Brewer again advised her to leave, and she did not depart. [*Id.*].

Meanwhile, Defendant Deputy Anderson interviewed Defendant Goodson at her residence, who told him that Plaintiff came into her driveway and dropped off a crate full of cats and remained on the property in her car. [Docs. Docs. 72-2 at 17; 72-5 at 12; 72-11]. Defendants spoke twice after the initial exchange. The second conversation provided Defendant Goodson with an update on the situation outside and lasted approximately a minute. The final conversation informed Defendant Goodson of Plaintiff's arrest and Defendant Deputy Anderson inquired about the cats' care[1]. [Doc. 72-2 at 19-20]. Defendant Goodson neither asked Defendant Deputy Anderson nor Deputy Brewer to arrest Plaintiff. [Docs. 72-2 at 34; 72-5 at 19].

Defendant Deputy Anderson observed the crate of cats in the middle of the driveway. [Doc. 72-5 at 3]. Both deputies approached and warned Plaintiff that if she did not leave the area she could be arrested.

---

[1] The cats were in good health and were safely brought to Ms. Burgett for care later that evening. [Docs. 72-3, at 9; 72-9].

4

Plaintiff again failed to vacate the property stating that she would not leave until the cats were taken care of by Defendant Goodson and safe. [Doc. 72-4 at 11-13, 18]. Defendant Deputy Anderson again warned Plaintiff to leave, and after her refusal, Defendant Deputy Anderson placed Plaintiff in custody. [*Id.* at 12; 72-5 at 18].

Plaintiff was then arrested for criminal trespass, a Class C misdemeanor, with the victim listed as Defendant Goodson. [Docs. 72-1 at 13; 72-10; 72-11; 72-15]. Plaintiff's charge was later dismissed, and the costs were taxed to the state. [Doc. 72-17].

Subsequently, plaintiff filed this action. In the November 2, 2017 complaint, Plaintiff seeks damages against Defendant Deputy Anderson, in his individual capacity, and Defendant Goodson for violating her state and constitutional rights. [Doc. 1 at 5]. Specifically, Plaintiff asserts state law claims for false arrest and malicious prosecution and a series of constitutional claims under 42 U.S.C. § 1983.

## II.     STANDARD OF REVIEW

A grant of summary judgment is proper, pursuant to Federal Rule of Civil Procedure 56, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those defined by substantive law and necessary for the application of the law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id*. The U.S. Supreme Court interprets Federal Rule Civil Procedure 56 as mandating the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A failure of proof concerning an element of the nonmoving party's prima facie case renders all other facts immaterial. *See id*. A party seeking summary judgment bears the initial responsibility of informing the Court of the basis for its motion. *Id.* at 323.

## III. DISCUSSION

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. "Section 1983 is not the source of any substantive right," *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001), but creates a "species of tort liability" for the violation of rights guaranteed in the Constitution itself, *Manuel v. City of Joliet, Ill.*, 580 U.S. ___, ___, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).

### A. Claims Against Defendant Deputy Anderson

Deputy Anderson argues that he is immune from suit in his individual capacity and claims that he is entitled to qualified immunity for the alleged Fourth Amendment violations, i.e. false arrest, false imprisonment and malicious prosecution.

> In determining an officer's entitlement to qualified immunity [this Court] follow[s] a two-step inquiry.[2] *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). First, taken in the light most favorable to the plaintiff, [the Court] decide[s] whether the facts alleged show the officer's conduct violated a constitutional right. *Id.* at 201. If no constitutional right would have been violated were the plaintiff's allegations established, there is no need for further inquiry into immunity. If a violation can be made out on a favorable view of the plaintiff's submissions, [the Court] next ask[s] whether the right was clearly established. *Id.*

*Vakilian v. Shaw*, 335 F. 3d 509, 516-17 (6th Cir. 2003). In general, government officials performing discretionary functions are shielded "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "[A]ll but the plainly incompetent or those who knowingly violate the law" are protected by the affirmative defense of qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The relevant question for the Court regarding whether the right was clearly established is not the

---

[2] The Supreme Court has held that the *Saucier* approach is no longer mandatory, and the district courts can elect to decide the second issue without determining whether a constitutional violation actually occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). This Court will use the two-step approach of *Saucier*.

subjective intent of the defendant, but whether a reasonable officer would have believed the defendant's conduct to be lawful, in light of the clearly established law and information possessed by the defendant. *Anderson*, 483 U.S. at 640. When the defense is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007). In other words, the Court must view the facts in the light most favorable to the plaintiff. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id.*

Plaintiff's false imprisonment claim arises out of her alleged false arrest, so the elements of these causes of action are the same in this case. *Corvin v. Bice*, No. 1:05-cv-219, 2007 WL 776501, at *4 (E.D. Tenn. March 9, 2007) (considering federal false imprisonment and false arrest claims); *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, at *20 (E.D. Tenn. Dec. 12, 2005) (considering Tennessee common law claims). To prove false arrest, Plaintiff must show the arresting officer lacked probable cause to arrest her. *Shearon v. Womack*, No. 3:15-cv-01061, 2017 U.S. Dist. LEXIS 183503, at *3 (M.D. Tenn. Nov. 3, 2017). A claim for false arrest under Tennessee law has two elements: the detention or restraint of one against his will and the unlawfulness of such detention or restraint. *Newsom v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994). To prevail on a claim for malicious prosecution in Tennessee, a plaintiff must prove: (1) a prior suit or judicial proceeding was instituted without probable cause; (2) defendant brought the prior action with malice; and (3) the prior action was finally terminated in the plaintiff's favor. *Shearon*, 2017 WL 5126180, at *3 (citing *Roberts v. Fed. Express Corp.*, 842 S.W.2d 246, 247-48 (Tenn. 1992)).

Further, the existence of probable cause is critical to the determination of whether the officer's conduct violated the plaintiff's Fourth Amendment constitutional rights. *Crockett v. Cumberland College,* 316 F.3d 571, 580 (6th Cir. 2003) ("It is well established that any arrest without probable cause violates the Fourth Amendment."). For probable cause for an arrest to exist, the "facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is

7

about to commit an offense." *Thacker v. City of Columbus,* 328 F.3d 244, 255 (6th Cir. 2003) (internal citation and quotation omitted). Whether "a probability of criminal activity" exists is assessed under a "reasonableness standard" that is based on a consideration of "all facts and circumstances within an officer's knowledge at the time of an arrest." *Id.* In short, "there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the factual and practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred." *U.S. v. Strickland,* 144 F.3d 412, 415 (6th Cir. 1998) (internal quotation omitted). The analysis is commonsense, not hyper-technical, and objectively accounts for the nuances, particulars, inferences, and details of the situation on the ground at the time of the decision to seize. *See Texas v. Brown*, 460 U.S. 730 (1983). The absence of probable cause is thus essential to each of Plaintiff's state and federal claims. *See Shearon*, 2017 WL 5126180, at *3 (reviewing federal and state claims for false arrest and malicious prosecution).

Here, Plaintiff was arrested and charged for trespassing under Tennessee Code Annotated § 39-14-405, which prohibits a person from:

> (a) enter[ing] or remain[ing] on property, or any portion of property, without the consent of the owner. Consent may be inferred in the case of property that is used for commercial activity available to the general public or in the case of other property when the owner has communicated the owner's intent that the property be open to the general public.

T.C.A. § 39-14-405(a). The statute also enumerates defenses, which include:

> (1) A person entered or remained on property that the person reasonably believed to be property for which the owner's consent to enter had been granted;
>
> (2) The person's conduct did not substantially interfere with the owner's use of the property; and
>
> (3) The person immediately left the property upon request.

T.C.A. § 39-14-405(b).

Therefore, in order to have had probable cause to arrest Plaintiff, Defendant Deputy Anderson had to reasonably believe, based on the facts and circumstances known to him at the time of arrest, that Plaintiff entered or remained on the subject property without the consent of Defendant Goodson.

Defendant Deputy Anderson observed the crate with cats and kittens on Defendant Goodson's driveway approximately twenty feet from the garage door. From his observation, he determined that Plaintiff had entered the property because of the placement of the crate of cats in the driveway, which was interfering with the use of the driveway and garage. Defendant Deputy Anderson interviewed Defendant Goodson as part of his investigation, and she had communicated that she did not want the Plaintiff to drop off the crate of cats on her property, but that Plaintiff had shown up anyway with the cats. Based on the interview, Defendant Deputy Anderson reasonably determined that Plaintiff did not have consent to enter Defendant Goodson's property.

Defendant Deputy Anderson could not reasonably determine that any statutory defenses applied in Plaintiff's favor. Plaintiff was inside her vehicle parked in proximity of the Goodson house when Defendant Deputy Anderson arrived. Plaintiff told the deputies that she was waiting for cats to be taken care of by Defendant Goodson. A reasonable person could understand that police presence signals that an intrusion on private property is unwanted; Plaintiff could not reasonably believe to be on the property with Defendant Goodson's consent. Moreover, Defendant Deputy Anderson could reasonably believe that Plaintiff reasonably understood that she remained on the Goodson property without the Goodson's consent, especially after the police had arrived and had inquired about her entering and lingering on the property. Further, the placement of the crate of cats was in the middle of the driveway in front of the garage. Plaintiff's conduct substantially interfered with the Goodson's use of the garage and driveway; the owners would not reasonably be able to exit the garage without potentially encountering the crate filled with live animals. Finally, Plaintiff did not immediately leave the property upon request. Plaintiff repeatedly refused to comply with the deputies' instructions to leave the premises. Instead, Plaintiff blatantly had told the deputies that she would not leave until the cats were taken inside.

9

Based on the facts and circumstances known to him, Defendant Deputy Anderson had probable cause to arrest Plaintiff for criminal trespass. *See Thacker,* 328 F.3d at 255. Defendant Deputy Anderson's arrest of Plaintiff was valid, and no constitutional violation occurred. For the aforementioned reasons, the Court will GRANT summary judgment on Plaintiff's Fourth Amendment and state law claims as to Defendant Deputy Anderson.

### B. Claims Against Defendant Goodson

"Section 1983 does not, as a general rule, prohibit the conduct of private parties acting in their individual capacities." *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007). Defendant Goodson is a private citizen, and to be subject to § 1983 liability, her conduct must be "fairly attributable to the state." *Collyer v. Darling*, 98 F.3d 211, 231-32 (6th Cir. 1996) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)).

Private citizens acting in concert with governmental actors may, on occasion, also be held liable, but this exception remains narrow. *See Redding v. St. Eward*, 241 F.3d 530, 533-34 (6th Cir. 2001) (noting that the acts of a private citizen may be actionable under § 1983 if the private citizen acts in concert with governmental actors). The joint action test requires that there be a sufficiently close relationship between the state and the challenged action such that it is fair to treat the action of the private actor as that of the state itself. *Id.* (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). A conspiracy between private actors and state actors can satisfy the joint action test. *See Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985). To validly allege a civil conspiracy, the plaintiff must allege facts to show the parties made a single plan, in pursuit of the shared objective, and an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury. *Id* at 944. However, with regard to joint action, courts uniformly hold that merely "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'" *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009).

Defendants argue that they did not engage in concerted action or conspire to have Plaintiff arrested. Defendant Deputy Anderson contends that Defendant Goodson did not instruct, request, advise, pressure or persuade him to arrest the Plaintiff. [Doc. 74 at 20]. Defendant Deputy Anderson maintains that his decision to arrest the Plaintiff was made independently and was based on his training and experience as a certified law enforcement officer after he had determined that probable cause existed based upon the facts and circumstances within his knowledge at the time of Plaintiff's arrest. [*Id.*]. Defendant Goodson contends "that she did nothing more than provide information to a police officer" to help aid him in responding to her 911 call. [Doc. 77 at 10].

Defendant Goodson spoke to Defendant Deputy Anderson three times the evening of November 7, 2016. Defendant Deputy Anderson initially interviewed Defendant Goodson, where she relayed information to him about the events that led to her unwanted guest 911 call. Defendant Goodson did not act under color of law by providing information to the police, and responding to Defendant Deputy Anderson's questions to assist in his investigation. *See Moldowan*, 578 F.3d at 399. The second conversation between the defendants provided Defendant Goodson with an update of the events occurring outside and, in their final conversation, Defendant Deputy Anderson informed Defendant Goodson of Plaintiff's arrest and inquired about the care of the cats. The three brief conversations do not amount to a single plan between the Defendants with a shared objective to arrest Plaintiff. Defendants both affirm that Defendant Goodson never requested the deputies to take action to arrest Plaintiff. Because Defendant Goodson's actions were not taken "under color of law," she cannot be sued under § 1983. Accordingly, the Court will GRANT summary judgment as to Defendant Goodson.

**C. Fourteenth Amendment Claims**

Plaintiff also claims Defendants deprived her of liberty without due process of law. Plaintiff's reliance on the Due Process clause is misplaced.

In *Gerstein v. Pugh*, the Supreme Court explained that "[t]he Fourth Amendment [probable cause requirement] was tailored explicitly for the criminal justice system, and its balance between individual public interests always has been thought to define the 'process that is due' for seizures of person or

11

property in criminal cases . . . ." 420 U.S. 103, 125 n.27 (1975). Thus, where probable cause exists for a criminal prosecution under Fourth Amendment standards, procedural due process has also been satisfied under the Fourteenth Amendment. *See Gehl Group v. Koby*, 63 F.3d 1528, 1538 (10th Cir. 1995).

The Sixth Circuit used that same reasoning in *Radvansky v. City of Olmsted Falls*, where the plaintiff brought a § 1983 claim consisting of claims under the Fourth Amendment, Equal Protection Clause, and Due Process Clause. 395 F.3d at 313. There, the court held that although the officers involved did not have probable cause to arrest the plaintiff under the Fourth Amendment, the plaintiff's reliance on the Due Process Clause was "misplaced . . . because it is the Fourth Amendment which establishes procedural protections in this part of the criminal justice area." *Id.* "[B]ecause the Due Process Clause of the Fourteenth Amendment does not require any additional procedures beyond those mandated by the Fourth Amendment," the Sixth Circuit affirmed the trial court's grant of summary judgment on the plaintiff's due process claim. *Id.*

Plaintiff also invokes the substantive protections of the due process clause, but those protections do not apply. "Where a particular [a]mendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens)). As such, the Court defers to its Fourth Amendment analysis under *Graham*.

Under the Court's previous Fourth Amendment analysis, the Court has held there was probable cause for plaintiff's charge, as explained above, summary judgment will be GRANTED for Defendants on this claim.

## IV.    CONCLUSION

For the aforementioned reasons, Defendant Deputy Anderson's Renewed Motion for Summary Judgment, [Doc. 72], is GRANTED. Likewise, Defendant Goodson's Renewed Motion for Summary

Judgment, [Doc. 76], is GRANTED. Defendant Goodson's Motion to Stay, [Doc. 85], is DENIED as MOOT. A separate judgment shall enter.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE